UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEVIN JOHNSON, JR.,

Plaintiff,

v.

WEST ALLIS POLICE DEPARTMENT, ERIN L. LUEDKE, MICHAEL A. OTTO, ALEX K. RIESTRA, JOSHUA SCHENK, KYLE A. BROCKMAN, OFFICER OLIDEN, REID N. SEGHER, MICHAEL E. DOBECHUETZ, SERGIO D. MEDINA SANTA CRUZ, JUSTIN SCHRANDT, MICHAEL LAZARIS, and JANE AND JOHN DOES,

Defendants.

Case No. 25-CV-1999-JPS

**ORDER**

## 1. INTRODUCTION

Plaintiff Kevin Johnson, Jr. ("Plaintiff"), an inmate currently confined at the Milwaukee County Jail, filed a pro se complaint in this matter alleging, inter alia, violations of his constitutional rights under 42 U.S.C. § 1983 against the West Allis Police Department, Erin L. Luedke, Michael A. Otto, Alex K. Riestra, Joshua Schenk, Kyle A. Brockman, Officer Oliden, Reid N. Segher, Michael E. Dobechuetz, Sergio D. Medina Santa Cruz, Justin Schrandt, Michael Lazaris, and Jane and John Does (collectively,

"Defendants"). ECF No. 1.[1] He also filed for leave to proceed without prepayment of the filing fee. ECF No. 3. This Order screens Plaintiff's complaint and resolves Plaintiff's motion for leave to proceed without prepaying the filing fee.

## 2. MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS

The Prison Litigation Reform Act ("PLRA") applies to this case because Plaintiff was a prisoner when he filed his complaint. *See* 28 U.S.C. § 1915(h). The PLRA allows the Court to give a prisoner plaintiff the ability to proceed with his case without prepaying the civil case filing fee. *Id.* § 1915(a)(2). When funds exist, the prisoner must pay an initial partial filing fee. 28 U.S.C. § 1915(b)(1). He must then pay the balance of the $350 filing fee over time, through deductions from his prisoner account. *Id.*

On March 31, 2026, the Court ordered Plaintiff to pay an initial partial filing fee of $24.83. ECF No. 6. Plaintiff paid that fee on June 1, 2026. June 1, 2026 docket entry. The Court will grant Plaintiff's motion for leave to proceed without prepaying the filing fee. ECF No. 3. He must pay the remainder of the filing fee over time in the manner explained at the end of this Order.

## 3. SCREENING THE COMPLAINT

### 3.1 Federal Screening Standard

Under the PLRA, the Court must screen complaints brought by prisoners seeking relief from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint if the prisoner raises claims that are legally "frivolous

---

[1]The Court will use the Defendants' last names to identify them individually, coupled with the title Plaintiff assigns to them.

or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

In determining whether the complaint states a claim, the Court applies the same standard that applies to dismissals under Federal Rule of Civil Procedure 12(b)(6). *See Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017) (citing *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899 (7th Cir. 2012)). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States and that whoever deprived him of this right was acting under the color of state law. *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan–Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). The Court construes pro se complaints liberally and holds them to a less stringent standard than pleadings drafted by lawyers. *Cesal*, 851 F.3d at 720 (citing *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015)).

### 3.2 Plaintiff's Allegations

On November 22, 2024, while "Door Dashing" in West Allis as a passenger in his friend's truck, Plaintiff noticed two police trucks blocking

the road. ECF No. 1 at 2. Not understanding "why the road was blocked" or "where to go," the truck in which Plaintiff was an occupant immediately stopped. *Id*. After later obtaining a report regarding the incident, Plaintiff identified Sergeant Segher as one of the officers blocking the road with a police truck. *Id*. "Out of nowhere" and "for no reason at all," one of the police trucks began "ramming the truck" that Plaintiff was in "until it almost titled over sideways." *Id*. After the ramming stopped, Sergeant Dobechuetz and Officer Schenk took turns breaking the passenger side window, where Plaintiff was seated while "threats about being shot were being made." *Id*. at 3. "Plaintiff placed his phone against the window to prove and show officers" that he and (the other two occupants in the car) "were just Door Dashing and not committing crimes." *Id*. Plaintiff called his probation officer in fear for his life. *Id*. While one of other occupants in the truck was being "brutally assaulted," "numerous cops threatened to shoot Plaintiff in the head while pointing guns at him from multiple directions," with Sergeant Dobechuetz remarking that the officers had "'lethal coverage' the entire time." *Id*. When Plaintiff was ordered to step out of the vehicle, he remained on his phone with his probation officer, at which point the "officers threatened to shoot if he didn't drop his phone and get on his knees." *Id*. While still on his phone, Plaintiff "repeated what was said to him" to his probation officer and "that he didn't want to move because white officers are known to shoot and/or kill black men and get away with it." *Id* at 4. After telling his probation officer the "driver's name," Plaintiff was "tased without warning and fell to the ground." *Id*. When asked why he was tased, an unidentified officer replied, "because it felt good." *Id*. Plaintiff then had "his hair pulled" while being "hit by multiple closed

fist[s] [and] knees." *Id*. "Plaintiff repeatedly screamed he was not resisting." *Id*.

At that point, certain officers, which Plaintiff does not name, performed a pat-down on Plaintiff. *Id*. Plaintiff claims he was arrested without being told why. *Id*. Plaintiff reported to officers that his arrest was because he was "a black man wearing a black sk[i] mask, riding late at night in a white neighborhood" with someone officers "assumed to be a white woman." *Id*. Officer Otto replied that he "observed a black male wearing a ski mask in a white truck make a legal right turn going the legal speed limit but still decided to turn completely around and go the opposite direction to catch up" to the truck Plaintiff was in "just to run t[he] license plate." *Id*. "Officers told Plaintiff: 'Don't come to this neighborhood and he won't have that problem.'" *Id*.

After finding out the driver was not white, but was actually "Latin-descen[d]ed," an "unidentified officer had to be physically held back by the other surrounding officers from shooting Plaintiff" when "[a]nother unidentified officer stated "let him do[] it," i.e., shoot Plaintiff in the head, to "teach (the Plaintiff) a lesson." *Id*. at 5. Plaintiff believes that Officer Otto told him that "if he knew she (the . . . driver) wasn't white he would have shot and killed all three of [them] and got away with it because he wouldn't have called it in." *Id*.

Once at the police station, Luedke identified herself as the shift sergeant and informed Plaintiff that he was arrested for "a loaded handgun under his seat and the truck being reported stolen three days before." *Id*. Plaintiff believes Officer Otto planted the gun under his seat. *Id*. "Luedke informed Johnson he would not be going home this time like the black

Captain allowed last time," and she "even mentioned something about him being killed because of it." *Id*.

Plaintiff was then "escorted inside and roughly slammed against a wall and told to spread his legs for another [p]at search." *Id*. Plaintiff reported to officers that, due to a prior neck injury and previously being shot in the face, he could not spread his legs any more or stop shaking. *Id*. An unidentified officer then began a pat search and purposely began grabbing the Plaintiff's penis and buttock. *Id*. at 6. Plaintiff yelled that it was a "P[REA] violation," ostensibly a reference to Prison Rape Elimination Act, "and wanted something to be done about it." *Id*. Officers replied, "don't be disruptive and it wouldn't happen." *Id*. "The same unidentified officer then began unfastening the Plaintiff's belt, with a w[ei]rd smile on his face, which made Plaintiff very uncomfortable." *Id*. Luedke, who was standing behind Plaintiff during this encounter, asked him if he wanted to file a PREA report, to which Plaintiff replied "yes." *Id*.

Plaintiff was then escorted to his cell where he was "placed on his knees with his pants down," while officers "attempted to cut [his] clothes off, but stopped." *Id*. Officers eventually helped him pull his pants up. *Id*.

At this point, Plaintiff was "physically battered until he lost consciousness." *Id*. Sergeant Segher, Officer Riestra, Officer Otto, Sergeant Dobechuetz and a few more unidentified officers all hit Plaintiff with a closed fist and kicked him multiple times. *Id*. Plaintiff alleges he was spit in his face as well. *Id*. Plaintiff was then tased in the face by an unidentified officer. *Id*.

At this point, Officer Dobechutz, Officer Lanzario, Officer Otto, Officer Santa Cruz Medina, Officer Riestra, Officer Schenk, Officer Oliden, Officer Segher, Officer Kyle Brockman, and Officer Justin Schrandt came

into Plaintiff's cell and continued to assault him, then handcuffed Plaintiff behind the back; they then took a taser and stuffed it in between Plaintiff's buttock and rammed it with great force into Plaintiff's anus and tased Plaintiff. *Id*. They took turns doing so. *Id*. at 7. Luedke stood at the door watching. *Id*. Every officer in the cell with Plaintiff continued this assault, sticking the taser in and out of Plaintiff as if it was a sex act. *Id*. He begged them to stop before he lost consciousness again. *Id*. None of the officers stopped the assault or rendered aid. *Id*.

Plaintiff claims that the cell was equipped with a security camera; he also claims he was forced to go to the hospital after the assaults. *Id*. Plaintiff reported that he did not want to go or leave his cell because he did not feel safe around any police officer and did not trust them; Plaintiff believed they planned to murder him. *Id*. While being escorted in the hallway, three unidentified officers continued to physically assault Plaintiff by punching him with closed fist, twisting the cuffs at his wrist, and forcing Plaintiff to walk at a faster pace with shackles on his ankles. *Id*. Plaintiff was then slammed into the medical cart with his hands cuffed behind his back and officers hit him with a closed fist again for no reason. *Id*.

Plaintiff then went to the hospital to see if he had ever been shot to confirm what he told officers earlier, but he was not treated for the assault that had occurred. *Id*. at 8. He told the nurses that tended to him about the assaults, but they did not report it. *Id*. They advised him to take it up "with a judge" and that "rape kits are for girls or real victims." *Id*. Hearing the exchange, Officer Santa Cruz Medina and another unidentified officer acted as if they were proud about what they had done, "smiling weirdly and making sick comments about how good it felt, worth their time [it was], and exciting it was." *Id*.

Plaintiff seeks $100,000,000 in damages against each Defendant on the basis of unlawful seizure, unlawful search, excessive force, and Eighth Amendment violations. *Id*. at 11.

### 3.3 Analysis

At first glance, this case sits on the border between "'delusional, irrational, [and] wholly incredibly'" and litigation that is "merely 'unlikely,' 'improbable,' or 'strange.'" *Felton v. City of Chicago*, 827 F.3d 632, 635 (7th Cir. 2016) (quoting *Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992) (noting that if a case falls in the latter group, it cannot be dismissed as a frivolous)). To understand where this case sits, the Court turns to *Felton*, in which the Seventh Circuit confronted a pro se plaintiff who made the following allegations:

> On March 15, 2014, Felton was in a car in Harvey, Illinois, when he was approached by an unmarked car with "black tinted windows." This caused Felton, who was unarmed, to fear for his life. He fled, turning onto the expressway and heading toward Chicago. Chicago police officers "chased" him along the expressway and fired their guns at him (but Felton does not say he was hit). The officers then "ram[med]" their cars into his, causing him to "swerve out of control" and crash. At some point, he was "shot by 6 different stu[n] guns." As a result of the officers' actions, Felton was "put into critical condition" and suffered broken bones, bruises, a concussion, lost vision, and other injuries. He underwent several surgeries and suffered "excruciating pain and mental anguish." He brought this suit under 42 U.S.C. § 1983, alleging the officers used constitutionally excessive force.

827 F.3d at 634. According to the Seventh Circuit, "Felton's allegations—that when he fled officers along an expressway, they chased him, rammed his car, and used stun guns on him—were not frivolous." *Id*. (citing *Denton*, 504 U.S. at 33). Here, however, Plaintiff's allegations go way beyond a car

chase, vehicular attack, and the deployment of stun guns. Plaintiff's allegations may start there. But they do not end there. His allegations involve a "vast, encompassing conspiracy." *Walton v. Walker*, 364 F. App'x 256, 257–58 (7th Cir. 2010) (quoting *Cooney v. Rossiter*, 582 F.3d 967, 971 (7th Cir. 2009)); ECF No. 1 at 7 ("Plaintiff believed they planned to secretly murder him."). As a result, Plaintiff's complaint is subject to a "high standard of plausibility" meaning that it cannot be filled with "nothing more than 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Iqbal*, 556 U.S. at 678). This standard is in place is to prevent "subjecting defendants to 'paranoid pro se litigation.'" *Id*. (quoting *Cooney*, 582 F.3d at 971).

As a starting point, the "sheer size of the alleged conspiracy"—spanning the officers on patrol (who rammed into his vehicle "for no reason" and "out of nowhere") to those who arrested him to the jail personnel who escorted him into his cell to the jail personnel who escorted him to the hospital—"points in the direction of paranoid fantasy." *Id.* at 257. True, Plaintiff provides many (graphic) details regarding the alleged misconduct of various officers and recites several specific conversations he supposedly had with officers along the way, thereby distinguishing the facts here from a case based on naked assertions.

But Plaintiff ultimately does not provide any factual enhancement to plausibly link the officers' individual conduct to a broader conspiracy. For instance, consider Plaintiff's allegations that the shift sergeant, Luedke, "informed [Plaintiff] he would not be going home this time like the black Captain allowed last time," and that she "even mentioned something about him being killed because of it." ECF No. 1 at 5. In accepting those allegations as true, one can perhaps make an inference regarding the officer's alleged

motive and state of mind, but one cannot make all the inferences Plaintiff suggests. Indeed, those allegations do not support the inference that officers in West Allis previously attempted to murder an individual like Plaintiff, nor do they lead to the inference that Defendants were acting according to a larger conspiracy to murder Plaintiff. Taken together, Plaintiff's allegations fall well short of the heightened pleading standard applicable in cases like this one and, in fact, amount to the sort of wholly incredible allegations that the Court has an obligation to dismiss. *See Dodd v. Ind. Dep't of Corr.*, No. 3:21-CV-972-JD-MGG, 2022 WL 4182359, at *3 (N.D. Ind. Sept. 13, 2022) ("Although not every single allegation in the complaint is factually impossible, collectively it is clear his claims are 'fanciful, fantastic, and delusional.'" (quoting *Denton*, 504 U.S. at 33)). Removing any lingering doubt that this Court may have had is Plaintiff's final set of allegations. ECF No. 1 at 8 (alleging that the nurses at the hospital told him "rape kits are for girls or real victims" only). *See Littlejohn v. Dalton*, No. 1:21-cv-4885-MLB, 2022 WL 20663595, at *2 (N.D. Ga. Feb. 23, 2022) (agreeing with the magistrate's finding "that an allegation of a wide-ranging conspiracy of detention center officials, including a physician, is simply too incredible to credit").

"In the end," the Court is "left to rely on its own sense of reality. A reality informed by the Court's experience." *Walton v. Walker*, No. 08-cv-486-MJR, 2009 WL 1470409 (S.D. Ill. May 27, 2009), *aff'd by* 364 F. App'x 256. "The Court is all too familiar with paranoid prisoners who—like Plaintiff—assert that everything . . . is a grand conspiracy against them." *Id.* "There is no question that if Plaintiff were transferred to another facility that the staff at that prison would soon be named in a new § 1983 action with joining this 'conspiracy' against Plaintiff." *Id.* "In the reality as this Court knows it,

Plaintiff's claims are as fantastic as those concerning little green men." *Id.* As such, this case must be dismissed with prejudice as frivolous. *Dodd*, 2022 WL 4182359, at *3 (collecting cases).

## 4. CONCLUSION

"The usual standard in civil cases is to allow defective pleadings to be corrected, especially in early stages, at least where amendment would not be futile." *Id.* (quoting *Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018)). "However, 'courts have broad discretion to deny leave to amend where . . . the amendment would be futile.'" *Id.* (quoting *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009)). For the reasons previously explained, such is the case here; therefore, the Court will dismiss the case. The dismissal will operate with prejudice. *Greyer v. FBI*, No. 25-CV-440-JPS, 2025 WL 928802, at *2 (E.D. Wis. Mar. 27, 2025) (noting that frivolous cases are dismissed on the merits and thus, with prejudice (citing *El v. AmeriCredit Fin. Servs.*, 710 F.3d 748, 751 (7th Cir. 2013) and *Holland v. City of Gary*, 503 F. App'x 476, 478 (7th Cir. 2013)).

**IT IS ORDERED** that Plaintiff Kevin Johnson Jr.'s motion for leave to proceed without prepaying the filing fee, ECF No. 3, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that the agency having custody of Plaintiff shall collect from his institution trust account the $325.17 balance of the filing fee by collecting monthly payments from Plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to Plaintiff's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance

with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this case. If Plaintiff is transferred to another county, state, or federal institution, the transferring institution shall forward a copy of this Order along with his remaining balance to the receiving institution;

**IT IS FURTHER ORDERED** that the Clerk of Court shall mail Plaintiff a copy of his complaint, ECF No. 1, along with this Order; and

**IT IS FURTHER ORDERED** that a copy of this Order be sent to the officer in charge of the agency where Plaintiff is confined.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 13th day of November, 2026.

BY THE COURT:

J. P. Stadtmueller

U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. *See* FED. R. OF APP. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* FED. R. APP. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* FED. R.

APP. P. 24(a)(1). Plaintiff may be assessed a "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under limited circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* FED. R. CIV P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See* FED. R. CIV. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.